J-A21029-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| BRADLEY E. GOODRICH, INDIVIDUALLY AND IN HIS CAPACITY AS EXECUTOR OF THE ESTATE OF LISA A. GOODRICH, DECEASED | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | |
| v. | |
| DEBRA M. ROSA, M.D. AND VALLEY FORGE SURGICAL ASSOCIATES, LTD. AND SHARON FLEISCHER, M.D. AND POTTSTOWN MEDICAL SPECIALISTS, INC. | |
| Appellees | No. 391 EDA 2014 |

Appeal from the Judgment Entered January 30, 2014
In the Court of Common Pleas of Chester County
Civil Division at No(s): 11-06505

BEFORE:  BOWES, J., OTT, J., and STRASSBURGER, J.[*]

MEMORANDUM BY OTT, J.:　　　　　　　　**FILED NOVEMBER 21, 2014**

Bradley E. Goodrich ("Goodrich"), individually and in his capacity as Executor of the Estate of Lisa A. Goodrich, Deceased, appeals from the judgment entered January 30, 2014,[1] in favor of the defendants, Debra M.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] We note Goodrich filed his notice of appeal from the January 22, 2014, order of the trial court denying his post-trial motions.  It is well-settled, however, that "[a]n appeal to this Court can only lie from judgments entered subsequent to the trial court's disposition of post-verdict motions, not from the order denying post-trial motions." **Stahl Oil Co. v. Helsel**, 860 A.2d 508, 511 (Pa. Super. 2004) (quotation omitted), *appeal denied*, 885 A.2d 43

*(Footnote Continued Next Page)*

Rosa, M.D. ("Dr. Rosa"), Valley Forge Surgical Associates, Ltd. ("VFSA"),

Sharon Fleischer, M.D. ("Dr. Fleischer"), and Pottstown Medical Specialists,

Inc. ("PMS"), in this medical malpractice action.[2]  On September 30, 2013, a

jury returned a verdict in favor of the defendants, specifically finding Dr.

Rosa and Dr. Fleischer were not negligent.  Following the denial of post-trial

motions, Goodrich filed this appeal challenging the trial court's denial of his

pretrial motion in *limine* seeking to preclude evidence of the decedent's prior

prescription drug abuse.  For the reasons set forth below, we affirm.

The facts underlying this medical malpractice case are as follows.  In

2010, Lisa Goodrich ("the decedent") was a 44-year-old woman with chronic

health issues, including hypertension and obesity, and a family history of

---

*(Footnote Continued)*

(Pa. 2005).  Here, judgment was subsequently entered "in favor of defendants and against the plaintiff" on January 30, 2014.  Praecipe for Entry of Judgment, 1/30/2014.  **See also** Amended Notice of Entry of Judgment, Order or Decree, 2/20/2014. Therefore, we will treat Goodrich's appeal as if it was filed after the entry of judgment.  **See** Pa.R.A.P. 905(a) (providing that "[a] notice of appeal filed after the announcement of a determination but before the entry of an appealable order shall be treated as filed after such entry and on the day thereof").  **See also McEwing v. Lititz Mut. Ins. Co.**, 77 A.3d 639, 645 (Pa. Super. 2013).  Accordingly, we have directed the Superior Court Prothonotary to correct the appeal paragraph.

[2] As Goodrich notes in his brief, it does not appear from the docket entries that judgment was ever formally entered in favor of the medical practices, PMS and VFSA.  **See** Goodrich's Brief at 1-3.  However, because their liability was only derivative of any liability on the part of the doctor-defendants, we agree the judgment on appeal is final and appealable. Nevertheless, we direct the Chester County Prothonotary to formally enter judgment in favor of PMS and VFSA and against Goodrich.

heart disease. She was a family care patient of Dr. Fleischer at PMS. On January 7, 2010, she saw another doctor in the PMS practice when she experienced an elevated blood pressure reading at home. The doctor adjusted her medication and scheduled a follow-up appointment with Dr. Fleischer for the following week.

During that follow-up appointment, on January 12, 2010, the decedent described to Dr. Fleischer severe pain she had experienced the night before. Dr. Fleischer recounted the decedent's symptoms as follows:

> She told me that at 10:00 the night before she developed an Ace bandage feeling around her chest; she said it was hard for her to take a deep breath; some GERD means reflux symptoms for a few days; it hurt to breathe in deeply; she was slightly short of breath; a little off balance; she denied having any nausea or vomiting.

N.T., 9/27/2013, at 19. Although the pain had subsided by 5:00 a.m., at the time of her appointment, Dr. Fleischer testified the decedent still "felt a little dizzy, had a dull ache in the left side of her neck, down her arm and her chest; and something was not right." *Id.* at 20. Dr. Fleischer suspected the decedent was suffering from either coronary artery disease or gallbladder disease. N.T., 9/25/2013, at 21-22. The doctor performed an electrocardiogram ("EKG") in her office, the results of which were "fully normal." N.T., 9/27/2013, at 33. Dr. Fleischer then referred the decedent to the emergency room at Pottstown Hospital for evaluation. *Id.* at 34. Dr. Fleischer received a call, later that afternoon, from the emergency room doctor, who told her he "didn't find anything to suspect cardiac …

- 3 -

dysfunction." *Id.* at 40. Nevertheless, Dr. Fleischer ordered an ultrasound of the decedent's abdomen. *Id.* at 41. After the ultrasound was completed, the decedent was sent home. Later that day, the hospital electronically forwarded a copy of the ultrasound report to Dr. Fleischer. The report indicated the decedent had "multiple gallstones … and a thickened gallbladder wall." *Id.* at 42. The emergency room doctor diagnosed the decedent with "atypical chest pain of gallbladder disease with normal cardiac enzymes, as well as normal EKG[.]" *Id.* at 43.

The decedent next saw Dr. Fleischer on February 22, 2010. She reported no return of "chest tightness." *Id.* at 45. Dr. Fleischer discussed with the decedent the ultrasound report, and, ultimately, referred her to Dr. Rosa at VFSA for a surgical consultation. *Id.* at 56-57. Dr. Fleischer had no further contact with the decedent or Dr. Rosa.

The decedent first saw Dr. Rosa on March 2, 2010. The decedent reported "no history of chest pains, no history of palpitations, no history of irregular heartbeat, [and] no history of dizziness." N.T., 9/26/2013, at 28. Dr. Rosa obtained a copy of the decedent's ultrasound results for verification of the gallstones and discussed surgical intervention. *Id.* at 32-33. The decedent opted to have her gallbladder removed laparoscopically, and surgery was scheduled for March 12, 2010. *Id.* at 34. Although Dr. Rosa ordered pre-operative lab work, she did not request a cardiac clearance. Dr. Rosa explained that the decedent had no reported history of chest pains or palpitations, and had a prior normal EKG. *Id.* at 41. Further, her family

history of cardiac disease did not include her immediate family, but rather was remote, *i.e.*, an uncle and a cousin had heart disease. *Id.* Neither Dr. Fleischer nor the decedent told Dr. Rosa about the cardiac symptoms the decedent experienced in February.

On March 12, 2010, Dr. Rosa performed a laparoscopic cholecystectomy on the decedent. Due to post-operative discomfort, the decedent remained in the hospital overnight. She was discharged to her husband, Goodrich, in the early afternoon the next day. N.T., 9/25/2013 (Testimony of Goodrich), at 22. Goodrich took the decedent home and put her to bed in a second floor bedroom. He then went to the pharmacy to fill her prescription for Dilaudid, a pain medication, and gave her two pills, as prescribed, when he returned home.[3] *Id.* at 23, 25-26. Goodrich then helped the decedent to a chair, and went downstairs to cook dinner for their daughter. After dinner, he returned upstairs, and checked on the decedent. He testified that it looked as though she was sleeping because "[h]er head was back in the chair, and she was making a snorting type noise." *Id.* at 30. However, when the noise continued a short time later, Goodrich

_____

[3] Goodrich could not recall whether he had given the decedent any Klonopin, a medication she was prescribed for anxiety. *See* N.T., 9/25/2013 (Testimony of Goodrich) at 26-27. *See also* N.T., 9/24/2013 (Excerpted Testimony of Jonathan Arden, M.D.) at 61-62 (testifying that the decedent's medical records indicated she had an "ongoing prescription" for Klonopin to combat anxiety, and "had been given Dilaudid as post-operative pain medication.").

returned to the bedroom to try to wake her. When he received no response, he called 911, and attempted to perform CPR. *Id.* at 31.

The decedent was taken to the hospital, but died the next day. According to a urinalysis performed after her death, the decedent had both Benzodiazepine and opiates in her system, although a blood level analysis was never performed. N.T., 9/24/2013, at 47-48. An autopsy was performed on March 16, 2010, which revealed the decedent died from "cardiac arrest." *Id.* at 60.

Goodrich filed this medical malpractice action in June of 2011. In his first Amended Complaint, filed on April 20, 2012, Goodrich alleged negligence claims against Dr. Fleischer and Dr. Rosa, vicarious liability claims against their respective medical practices, PMA and VSFA, and wrongful death and survival claims against all of the defendants.[4] On September 4, 2013, Goodrich filed several motions in *limine* seeking to preclude certain defense evidence. Relevant to this appeal, he sought to preclude any reference at trial to the decedent's alleged prescription medication abuse or prior suicide attempts.[5]

---

[4] Specifically, Goodrich claimed the defendants were negligent for failing to order a cardiac workup prior to the decedent's surgery.

[5] Goodrich also filed motions to preclude references to the decedent's mental health, to Goodrich's alleged infidelity, and to the decedent's contraction of a sexually transmitted disease as a result of Goodrich's infidelity.

The case proceeded to a jury trial on September 23, 2013. The court bifurcated the trial into two phases, liability and damages. With respect to the liability phase, the trial court granted all of Goodrich's motions, except the motion in *limine* to preclude reference to the decedent's prior prescription drug abuse. Specifically, the court ruled:

> During [the liability] phase of the trial I am not going to preclude evidence or cross-examination on the issue of drug ingestion by the decedent on prior occasions and even that it was not inadvertent or accidental, but I am precluding reference to those prior occasions as attempts at suicide.

N.T., 9/24/2013, at 6.

On September 30, 2013, the jury returned a verdict for the defense, specifically finding **no negligence** on the part of either Dr. Fleischer or Dr. Rosa. Goodrich filed timely post-trial motions, which were denied by the trial court on January 22, 2014. This appeal followed.[6]

Goodrich raises one issue on appeal: Whether the trial court abused its discretion in failing to preclude evidence of the decedent's prior overdoses on prescription medications. He argues this evidence was irrelevant to the issues at trial. Further, he contends that even if we determine the evidence

_____

[6] On February 14, 2014, the trial court ordered Goodrich to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Goodrich complied with the court's directive, and filed a concise statement on March 5, 2014.

- 7 -

was relevant, its prejudicial impact outweighed any potential probative value.

Where, as here, a request for a new trial is based on an alleged erroneous evidentiary ruling:

> [W]e must acknowledge that decisions on admissibility [of evidence] are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law. **In addition, for a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party.**
>
> *Stumpf v. Nye*, 950 A.2d 1032, 1036 (Pa. Super. 2008). A party suffers prejudice when the trial court's error could have affected the verdict. *Trombetta v. Raymond James Financial Services, Inc.*, 907 A.2d 550, 561 (Pa. Super. 2006).

*Reott v. Asia Trend, Inc.*, 7 A.3d 830, 839 (Pa. Super. 2010) (emphasis supplied), *aff'd*, 55 A.3d 1088 (Pa. 2012).[7]

Pennsylvania Rule of Evidence 402 provides that "[a]ll relevant evidence is admissible" and that "[e]vidence that is not relevant is not admissible." Pa.R.E. 402.

---

[7] It is well-established that:

> An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.

*Catlin v. Hamburg*, 56 A.3d 914, 920 (Pa. Super. 2012), *appeal denied*, 74 A.3d 124 (Pa. 2013).

> Relevant evidence is defined as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable. Even if evidence is relevant, it may be excluded if its probative value is outweighed by, *inter alia*, the danger of unfair prejudice arising from its presentation to the fact-finder. Unfair prejudice supporting exclusion of relevant evidence means a tendency to suggest decision on an improper basis or divert the jury's attention away from its duty of weighing the evidence impartially. The function of the trial court is to balance the alleged prejudicial effect of the evidence against its probative value and it is not for an appellate court to usurp that function.

*Lykes v. Yates*, 77 A.3d 27, 33 (Pa. Super. 2013) (internal punctuation and citations omitted), *appeal denied*, 92 A.3d 812 (Pa. 2014).

Before trial, Goodrich sought to preclude all references to "the decedent's alleged past misuse of prescription medication," as well as her "supposed suicide attempts."[8] After the parties agreed to bifurcate the trial, and resolve the issue of liability, *i.e.*, negligence and causation, before the issue of damages, the trial court ruled that reference to the decedent's prior "drug ingestion," whether accidental or purposeful, would be permitted during the liability phase of the trial. N.T., 9/24/2013, at 6. However, the court specifically prohibited any "reference to those prior occasions as attempts at suicide." **Id.** Throughout the trial, the defendant doctors abided by the trial court's ruling, and did not refer to the decedent's prior drug overdoses as suicide attempts.

---

[8] Plaintiff's Motion in *Limine* to Preclude Reference at Trial to Decedent's Alleged Prescription Medication Abuse or Alcohol Abuse, 9/4/2013, at ¶ 2; Plaintiff's Motion in *Limine* to Preclude Reference at Trial to Decedent's Mental Health, 9/4/2013, at ¶ 4.

Goodrich argues that, nevertheless, "it is clear that this evidence [of the decedent's prior misuse of prescription medications] was presented to infer to the jury that [the decedent] had [suicidal] tendencies." Goodrich's Brief at 18. However, he asserts "[t]hose overdoses, and the inference of suicidal tendencies linked to them, are simply irrelevant to this case." *Id.* at 19. Relying on *Valentine v. Acme Market*, 687 A.2d 1157 (Pa. Super. 1997), he contends that "it cannot be proven that a person committed an act by showing that the person committed a similar act in the past" unless there is some correlation between the prior and present acts. *Id.* at 1160.

In *Valentine*, the plaintiff was injured when he fell in defendant's store, after hitting his leg on a pull-out shelf at the end of a counter. Over plaintiff's objection, the defendant was permitted to present evidence that plaintiff had experienced two prior, unexplained falls. After the jury returned a defense verdict, finding the counter was not defective, the plaintiff filed an appeal.

On appeal, a panel of this Court concluded that the trial court abused its discretion in admitting evidence of the plaintiff's prior falls. Specifically, the Court found there was no evidence his prior falls were related to a medical condition, which may have also caused his fall in the defendant's store. *Id.* at 1160. Further, the *Valentine* Court also found there was no evidence the plaintiff suffered injuries in his prior falls that were similar to those he suffered in the fall at issue. *Id.* The Court concluded:

- 10 -

The only purpose of this evidence, therefore, was to allow the jury to infer that because [the plaintiff] had fallen for no specific reason in the past, he probably just fell on his own this time too. This conclusion, however, is impermissible. Therefore, we find that the trial court abused its discretion in admitting evidence of [the plaintiff's] two prior falls.

***Id.***[9]

In the present case, however, there was a correlation between the decedent's prior overdoses and her sudden death in March of 2010. Specifically, a urine screen revealed the presence of opiates (Dilaudid) and Benzodiazepine (Klonopin). However, no blood screen was performed to determine the amount of medication in the decedent's system. N.T., 9/24/2013, at 47-48.

It was undisputed that the decedent had been prescribed Klonopin for anxiety and Dilaudid for pain,[10] and that she had taken her prescribed dosage of Dilaudid a few hours after she was discharged from the hospital. N.T., 9/25/2013 (Testimony of Goodrich), at 26-28. Moreover, Goodrich testified that he **may have** given her a dosage of Klonopin when she

_____

[9] Nevertheless, the ***Valentine*** Court ultimately concluded the trial court's error in admitting the evidence was harmless. The Court found the evidence of the plaintiff's prior falls "permitted the jury to infer that because [the plaintiff] had fallen on prior occasions, he fell in the instant case due to his own negligence." ***Valentine***, ***supra***, 687 A.2d at 1161. Therefore, it was relevant to the issue of the plaintiff's contributory negligence. However, the jury never reached that issue because it determined that the counter was not defective. Accordingly, the Court reasoned, "[w]ithout an initial breach of duty by [the defendant, the plaintiff] cannot recover." ***Id.***

[10] N.T., 9/24/2013 (Excerpted testimony of Jonathan Arden, M.D.), at 61-62.

returned home, but that he could not recall for certain.[11]  Furthermore, it was also undisputed that the decedent was hospitalized on three prior occasions – once in January of 2008, and twice in December of 2009 - for taking more than her prescribed dosage of Klonopin.  *Id.* at 37-38.  The last hospitalization was only three months prior to her death.

Although the forensic pathologist who performed the autopsy opined the decedent died of "heart disease, … hypertensive atherosclerotic cardiovascular disease,"[12] she also acknowledged that she was unable to determine, pathologically, "whether or not the patient suffered a respiratory arrest which then led to the cardiac arrest as opposed to a cardiac arrest that led to a respiratory arrest[.]"  *Id.* at 47.  Moreover, she agreed that the reported "gasping breaths" the decedent experienced shortly before her death could have been a sign of the decedent's respiratory arrest.  *Id.* at 60-61.

In fact, one of the defense experts, Dr. Elliot Gerber, opined that the decedent's death was precipitated by a respiratory arrest prior to her cardiac arrest, and that the respiratory arrest could have resulted from an overdose

_____

[11] Goodrich claimed that he controlled the decedent's medications, that he kept the Dilaudid in his pocket, and that the Klonopin was in a cabinet in the kitchen.  N.T., 9/25/2013 (Testimony of Goodrich), at 28.  He also testified that the decedent did not return downstairs after he put her to bed.  *Id.*

[12] N.T., 9/24/2013, at 57.  Specifically, the pathologist testified that the decedent's "proximal left anterior descending coronary artery" was "99 percent blocked."  *Id.* at 41.

of Klonopin and Dilaudid. N.T., 9/26/2013 (Excerpted Testimony of Defense Experts), at 18. He explained:

> The combination of Klonopin and Dilauded [sic] are both respiratory suppressants, and when used together, especially if used in doses in excess of what was prescribed, will dramatically suppress your respirations and also dramatically suppress your gag reflex[.] … If that reflex is suppressed by the combination of Dilauded [sic] and Klonopin, you can accidentally, if you vomit, accidentally inhale that into your lungs, which is what aspiration is.
>
> There were findings at autopsy that showed that this patient did, in fact, have a pneumonia in her lungs, consistent with aspiration, and it was seen on a chest X ray, as well as CAT scan, and the finding of the fact that she had acidic fluid in her mouth at the time that she had her arrest, all of that is consistent with aspiration being the cause of death.

*Id.* at 18-19. Therefore, in light of the above testimony, we agree with the trial court's conclusion that the fact that, on three prior occasions, the decedent had, either purposefully or inadvertently, taken more than the recommended dosage of her prescribed anxiety medication, Klonopin, each time necessitating her hospitalization, was relevant to the issue of causation. *See* Trial Court Opinion, 3/15/2014, at 1.

Goodrich argues, however, that "there is absolutely no evidence whatsoever that [the decedent] died from an overdose and, hence, no connection was established between these prior overdoses and her death." Goodrich's Brief at 22. The flaw in Goodrich's argument is the fact that, absent an affirmative defense or counterclaim, a defendant in a medical malpractice action has no burden of proof. **Neal by Neal v. Lu**, 530 A.2d 103, 109 (Pa. Super. 1987). Indeed,

- 13 -

the defendant's case is usually nothing more than an attempt to rebut or discredit the plaintiff's case. Evidence that rebuts or discredits is not necessarily proof. It simply vitiates the effect of opposing evidence.

*Id.*, at 109-110. Therefore, the defendant doctors had no obligation to **prove** the decedent died of an overdose. Rather, they simply put forth evidence in an attempt to discredit Goodrich's explanation for the decedent's cause of death. As Dr. Rosa explained in her brief, "[t]he evidence regarding prior misuse of medication was relevant as a basis to challenge [the] central principle of [Goodrich's] case, that is, that the decedent died from a cardiac event" which could have been prevented had the defendant doctor obtained a cardiac clearance prior to the gallbladder surgery. Dr. Rosa's Brief at 7. Because we agree that the evidence concerning the decedent's prior misuse of her prescription medication, and in particular, Klonopin, was relevant to the issue of her cause of death, we find no abuse of discretion on the part of the trial court in denying Goodrich's motion in *limine*.

However, Goodrich also argues that even relevant evidence may be inadmissible if it is "unfairly prejudicial" to the objecting party. Goodrich's Brief at 22. *See* Pa.R.E. 403 ("The court may exclude relevant evidence if its probative value is outweighed by a danger of … unfair prejudice"). He contends the evidence regarding the decedent's "overdoses, with the concomitant inference of suicide, was so inflammatory that a new trial is warranted even though the jury found no negligence on the part of the Doctors." Goodrich's Brief at 25. He relies on this Court's decision in ***Seals,***

- 14 -

*Inc. v. Tioga County Grange Mut. Ins. Co.*, 519 A.2d 951 (Pa. Super. 1986), for support.

In **Seals**, a fire destroyed a hardware store in a building owned by the insured. George Plank was the insured's President and sole shareholder. When the insured sought to recover benefits under its fire insurance policy, the insurer denied coverage because it believed "the fire was arson and George Plank was the arsonist." *Id.* at 954. Ten days after the fire, Plank purportedly shot and killed his girlfriend, and, later that same day, killed himself.

The insured instituted an action to recover the fire insurance proceeds. During the ensuing trial, the insurer was permitted to introduce evidence of Plank's murder-suicide to support its theory that Plank killed his girlfriend because she would not support his alibi for the night of the fire, and then killed himself because he feared prosecution for the arson. *Id.* at 954-955. The jury returned a verdict in favor of the insurer.

On appeal, this Court reversed and remanded for a new trial, concluding that the highly prejudicial character of the murder-suicide evidence outweighed its low probative value. *Id.* at 953. In particular, the Court noted that "[t]he evidence of Plank's suicide is only relevant to the arson defense if in fact Plank killed himself because he had set the fire." *Id.* at 955. However, there was no evidence that this was so, or even "that [Plank] had any inkling that he was under suspicion for arson." *Id.* at 956. Accordingly, the Court found the trial court abused its discretion in allowing

- 15 -

the jury to speculate that Plank set the fire, merely because he committed suicide a week later. *Id.* at 955.

Furthermore, the Court explained that the evidence of Plank's suicide was highly prejudicial to the insured's case:

> To commit suicide is in the minds of many a reprehensible, even immoral and sinful act. At minimum, it is the violent act of a severely troubled person. To this jury, evidence of such violence and mental instability, or even immorality, might have been enough to support in the jurors' minds an inference of arson. Since they may have decided on this clearly improper basis, a new trial without the suicide evidence is required.

*Id.* at 956.

We find the facts in **Seals** distinguishable from the case *sub judice*. First, in the present case, there was no mention of suicide, or even attempted suicide. Second, the testimony regarding the decedent's prior overdoses was relevant to the issue of the decedent's cause of death. **See** **supra** at 11-13. Conversely, in **Seals**, the evidence of Plank's suicide was not relevant to **any issue** in the case, and, in fact, permitted the jury to engage in "pure 'speculation'" that Plank must have set the fire because he committed suicide a week later. **Seals**, **supra**, 519 A.2d at 955. Third, as the trial court noted in its opinion, "the challenged evidence in this case was not introduced with respect to any issue that was **actually reached** by [the] jury." Trial Court Opinion, 3/15/2014, at 3 (emphasis supplied). Indeed, because the jury concluded that neither Dr. Fleischer nor Dr. Rosa were negligent, it never reached the issue of causation. Therefore, we detect no abuse of discretion on the part of the trial court in concluding "the evidence

- 16 -

objected to had no likelihood of causing the jury to decide this case on an improper basis." *Id.*

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/21/2014